941 So.2d 1057 (2006)
Manuel PARDO, Jr., Appellant,
v.
STATE of Florida, Appellee.
Manuel Pardo, Jr., Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-1966, SC04-2244.
Supreme Court of Florida.
June 29, 2006.
As Revised on Denial of Rehearing October 19, 2006.
*1059 Neal A. Dupree, Capital Collateral Regional Counsel, Leor Veleanu and Lucrecia *1060 R. Diaz, Assistant CCR CounselSouth, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Manuel Pardo, Jr., who is under a sentence of death, appeals the denial of a motion for postconviction relief and petitions for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the denial of postconviction relief and deny Pardo's habeas petition.

FACTS AND PROCEDURAL HISTORY
This is Pardo's first postconviction appeal in a case in which he was convicted of nine murders committed in five separate episodes between January and April of 1986. Pardo took the witness stand and admitted all of the killings. The facts below are taken partly from this Court's opinion in Pardo's direct appeal, Pardo v. State, 563 So.2d 77 (Fla.1990), and partly from the records in the direct appeal and the postconviction proceedings.
Pardo and a codefendant, Garcia, were charged with the murders. The trial court severed the defendants' trials after a mistrial, and each defendant was tried separately. Pardo's counsel withdrew a request for severance that had been granted on several counts. Pardo's trial encompassed nine counts of first-degree murder as well as charges for related robbery and firearm offenses. Id. at 78.
Before trial, Pardo's counsel had him examined by a clinical psychologist, Dr. Syvil Marquit, both for sanity at the time of the murders and competence to stand trial. Relying on Dr. Marquit's findings, trial counsel pursued a defense of insanity. Counsel stipulated that Pardo, a former police officer with college degrees in criminology and business management, was competent to stand trial. Three court-appointed experts, one a clinical psychologist and the other two forensic psychiatrists, evaluated Pardo based on the insanity defense. These witnesses, all of whom had substantial experience in conducting mental evaluations of criminal defendants, also evaluated Pardo for competence to stand trial. The three court-appointed experts testified at trial that Pardo was both competent to stand trial and legally sane. The defense expert, Dr. Marquit, testified that Pardo was competent to stand trial but legally insane.
Pardo testified in the guilt phase of the trial against the advice of counsel. Pardo insisted that he was sane and acknowledged that he killed all nine victims. He testified that all nine victims were drug dealers who had no right to live. In cross-examination of Pardo and argument to the jury, the State asserted that Pardo himself was involved in drug trafficking and that his motive for at least some of the murders was to take the victims' property or money. The State argued further that not all the victims were drug dealers; that one, Michael Millot, was killed because he was a confidential informant, and two, Sara Musa and Fara Quintero, were killed because they took money from Pardo to buy a videocassette recorder but failed to do so.
The jury found Pardo guilty of nine counts of first-degree murder and recommended the death penalty by votes ranging from eight-to-four to ten-to-two. The trial court found one aggravating circumstance as to each murder: that it was committed in a cold, calculated, and premeditated manner without moral or legal *1061 justification. The court also found a second aggravating circumstance as to two murders. The court found that the murder of purported drug informant Millot was for the purpose of hindering or disrupting the exercise of a government function, and that the murder of Mario Amador was for pecuniary gain. The trial court found the statutory mitigating factors that Pardo had no significant criminal history and committed the killings while under an extreme mental or emotional disturbance. The sentencing order also reflects that the trial court considered as nonstatutory mitigation that Pardo had served in the military, that he had once saved a child's life, and that he had his family's love and affection. The trial court sentenced Pardo to death on each of the nine murder counts.
Pardo raised five issues on direct appeal: (1) the trial court erred in not ordering a competency hearing; (2) the State did not carry its burden of proving he was sane when he committed the crimes; (3) prosecutorial misconduct in closing argument necessitated a mistrial; (4) none of the aggravating circumstances was proved; and (5) the trial court erred in declining to find the statutory mitigator that Pardo could not appreciate the criminality of his conduct or was seriously impaired in his ability to conform his conduct to the requirements of the law. This Court rejected each of Pardo's arguments. Id. at 79-80. In the State's cross-appeal, we determined that the trial court erred as to the seven murders in the final four episodes when it rejected the aggravating factor of prior capital felony conviction and found the statutory mitigator of no significant history of prior criminal activity. Id. at 80-81. Thus, Pardo's death sentences were supported by three aggravating circumstances as to one murder, two aggravating circumstances as to seven murders, and one aggravating circumstance as to one murder, weighed against one statutory mitigating circumstance and several nonstatutory mitigating circumstances. This Court found Pardo's sentence to be constitutionally proportional, and affirmed both the convictions and death sentences. Id. at 81. The United States Supreme Court denied certiorari. Pardo v. Florida, 500 U.S. 928, 111 S.Ct. 2043, 114 L.Ed.2d 127 (1991).
Pardo filed a motion to vacate his convictions and sentences, raising eleven issues.[1] In a supplemental motion, Pardo *1062 raised three additional issues.[2] The trial court granted an evidentiary hearing on three issues: (1) whether the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in failing to provide defense counsel an eight-hour videotaped statement by Carlo Ribera, (2) whether Pardo's trial counsel had a conflict of interest, and (3) whether counsel was ineffective in failing to move to sever the counts of first-degree murder into separate trials.
Two witnesses testified during the two-day hearing: Richard Seres, a film producer, and Ronald Guralnick, Pardo's trial counsel. Seres' testimony concerned a conflict of interest claim arising from Guralnick's contacts with Seres, which Pardo does not raise in this appeal.
In a written order issued after the evidentiary hearing, the trial court denied Pardo's motion for postconviction relief on all grounds. Pardo appeals, raising these issues: (1) the trial court's denial, without an evidentiary hearing, of his claims regarding inadequate expert mental health evaluations; (2) the denial, without an evidentiary hearing, of the claim that trial counsel was ineffective in waiving severance of counts; (3) the Brady issue; and (4) the denial of his ineffective assistance claim regarding failure to seek severance of counts.[3] Pardo has also filed a petition for a writ of habeas corpus, raising claims of ineffective assistance of appellate counsel and denial of a proper direct appeal because of omissions in the record.

POSTCONVICTION APPEAL

I. Pardo's Competence to Stand Trial
Pardo asserts that the trial court erred in denying an evidentiary hearing on his claims that he was incompetent to stand trial, that the expert witnesses who found him competent conducted inadequate mental health evaluations, and that trial counsel was ineffective in failing to request a competency hearing or investigate the cause of Pardo's alleged insanity and incompetence.
We agree with the trial court that Pardo's claims that he was incompetent to stand trial and that he received inadequate expert evaluations are procedurally barred. Pardo's assertion that he was tried while incompetent in violation of due process of law is merely a variant of his failed argument on direct appeal that the trial court should have ordered a competency hearing sua sponte. See generally Medina v. State, 573 So.2d 293, 295 (Fla.1990) ("[I]t is inappropriate to use a different argument to relitigate the same issue."). In rejecting this claim on direct appeal, we stated:
The court-appointed experts examined Pardo, found him to have been sane, and also determined that he was competent to stand trial. Thus, not only was there no reason for the court to have ordered a competency hearing, but also there was no prejudice to Pardo, as the hearing would not have benefited him.
Pardo, 563 So.2d at 79. Further, Pardo's assertion that the psychological evaluations we relied upon for this conclusion *1063 were performed incompetently could have been raised on direct appeal. See Rodriguez v. State, 919 So.2d 1252, 1267 (Fla.2005); Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003).
We reject Pardo's attempt to avoid the procedural bar by relying on the diagnosis of a thyroid and hormonal disorder that was made after he was sentenced but allegedly rendered him incompetent to stand trial. Like the performance of counsel, the competence of an expert's assistance should be evaluated from the perspective of the circumstances in which it was conducted, free of "the distorting effects of hindsight." Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). From this perspective, the evaluations of Pardo were not so deficient that he was denied his due process right to competent expert assistance under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
Pardo's assertion that he was incompetent to stand trial is also the basis for two claims of ineffective assistance of trial counsel, both of which were summarily denied. First, Pardo asserts that counsel should have requested a competency hearing. In summarily rejecting this claim, the trial court again relied on this Court's determination on direct appeal that the trial court had no reason to hold a competency hearing and that the hearing, if held, would not have benefited Pardo.
The record conclusively demonstrates that Pardo is not entitled to relief on this claim. As noted above, two forensic psychiatrists and two clinical psychologists concluded that Pardo was competent to stand trial. They explained their conclusions in terms consistent with the standards for competency set out in Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), and Florida Rule of Criminal Procedure 3.211(a)(2): sufficient present ability to consult with counsel plus a rational and factual understanding of the pending proceedings. In the direct appeal, this Court recognized that in light of the experts' conclusions that Pardo was competent, there was no reason for the trial court to order a competency hearing. Pardo, 563 So.2d at 79. For the same reason, trial counsel acted well within the wide range of reasonable professional assistance in declining to request that the trial court make a competency determination.
On this issue, this case is similar to Mason v. State, 489 So.2d 734 (Fla.1986). There, this Court remanded for an evidentiary hearing on whether evidence of the defendant's mental history discovered after trial would have changed the experts' conclusion that he was competent. However, we rejected Mason's related claim that counsel was ineffective in failing to request a competency hearing. We ruled that counsel had no duty to request a competency hearing after receiving reports from three psychiatrists finding the defendant competent. Id. at 735-36. Here, as in Mason, at the time of trial counsel "lacked any evidence indicating the need for such a procedure." Id. at 736. The unanimous opinions of the mental health experts in this case left counsel no basis on which to seek a competency determination. Accordingly, we find neither deficient performance nor prejudice in counsel's decision not to seek a hearing on Pardo's competency. We thus affirm the trial court's denial of relief on this claim.
Pardo further claims that counsel was ineffective in failing to alert the mental health experts to symptoms such as weight gain and hair loss that might have led them to diagnose Pardo's thyroid and hormonal disorder. In denying this claim, the trial court stated that "[i]f a medical doctor did not diagnose a physical disorder, *1064 it cannot be reasonably said that counsel was ineffective in failing to further investigate the cause of Defendant's insanity."
As the United States Supreme Court cautioned in Strickland, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. 2052. From counsel's perspective at the time he was preparing to defend Pardo, and without the distorting effects of hindsight, an investigation into any physical cause of Pardo's possible incompetence would not have been warranted. The tests for both insanity and incompetence focus on a defendant's thought processes and mental function rather than on physical conditions that might affect a defendant's mental function. Patton v. State, 878 So.2d 368, 375 (Fla.2004) (stating test for insanity in Florida); Fla. R.Crim. P. 3.211(a) (stating test for competency to stand trial). Rule 3.211(b), which concerns recommended treatments of incompetent defendants, in subdivision (1) requires experts to report on "the mental illness or mental retardation causing the incompetence" but not on physical illness. Thus, counsel, like the four mental health experts who evaluated Pardo, appropriately focused not on symptoms indicating a physical illness but on Pardo's mental functioninghis comprehension and ability to reason.
We distinguish Peede v. State, 748 So.2d 253 (Fla.1999), which involved a similar claim. In Peede, this Court reversed the summary denial of a postconviction motion asserting that trial counsel was ineffective in failing to assist a court-appointed psychiatrist and provide the psychiatrist important background information. Id. at 258-59. Peede alleged that the court-appointed expert was not provided hospital or medical records that were available and did not interview anyone familiar with the defendant's personal history. Id. at 258. The necessity for an evidentiary hearing rested largely on Peede's assertion that his "serious and preexisting mental illness" demonstrated by these records went undiscovered and could have affected the competency evaluation conducted by the court-appointed mental health expert. Id. at 259. In contrast, Pardo has not pointed to any existing medical records which, if shown to the mental health experts, would have changed their conclusions that Pardo was competent to stand trial. Instead, Pardo's claim rests on observations of physical symptoms which, as the trial court pointed out, did not indicate to a medical doctor a physical disorder bearing on Pardo's competency or sanity.
Thus, Pardo's counsel did not render constitutionally deficient performance in failing to alert the experts to a condition for which physical symptoms first appeared while Pardo was detained pending trial, and that was not diagnosed until after Pardo was convicted and sentenced. We affirm the summary denial of relief on this claim.

II. Trial Counsel's Failure to Present an Alibi for Two Murders
Pardo asserted below that trial counsel was ineffective in failing to investigate and present an alibi for the murders of Sara Musa and Fara Quintero. Pardo claimed that his wife was the source of the alibi, "which could have demonstrated that Mr. Pardo was nowhere near the scene of the murders." The motion contained no other details of the facts supporting the alibi. In denying the claim without an evidentiary hearing, the trial court noted that Pardo "does not allege what the alibi was or how the alibi could have changed *1065 the probability that he [would] be convicted." The trial court also observed that even if Pardo's wife had provided an alibi, Pardo "cannot now show that a different result would have been reached or show he was prejudiced."
We affirm on both grounds relied on by the trial court. First, Pardo's claim was insufficiently pled. In Jacobs v. State, 880 So.2d 548 (Fla.2004), we concluded that the petitioner set out a facially sufficient claim because he "specifically identified the alibi witnesses, stated the substance of their exculpatory evidence, and averred that they were known to counsel." Id. at 553. Here, the motion did not factually describe how Pardo's wife would have supported an alibi beyond stating that she would have demonstrated that he was "nowhere near the scene of the murders." Thus, this claim was insufficiently pled.
The trial court also concluded that Pardo did not show prejudice. We agree that the claimed alibi does not undermine judicial confidence in the convictions on the counts involving Musa and Quintero. In Jacobs we stated:
[A] claim of ineffectiveness in failing to present important exculpatory evidence cannot be resolved on the basis of the mere existence of conflicting evidence in the record. Rather, the record evidence must conclusively rebut the claim if the claim is to be resolved without a hearing. . . .
However, the mere existence of evidence of guilt is insufficient to conclusively rebut a claim of ineffectiveness in failing to present evidence of innocence in the form of known and available alibi witnesses.
Id. at 555.
In this case, compelling evidence established Pardo's guilt of the Musa and Quintero murders, capped by his own admission to the jury that he murdered the two women as well as the other seven victims. Thus, the record conclusively refutes any claim that Pardo was prejudiced by the absence of testimony by his wife that he was elsewhere when two of the nine murders in this case occurred. We therefore affirm the summary denial of relief on this claim.

III. Brady Issue: Nondisclosure of Videotaped Interview of State Witness
Following an evidentiary hearing, the trial court denied Pardo's claim that the State's failure to disclose videotapes of a police interview with State witness Carlo Ribera required a new trial. The trial court concluded that the videotapes did not undermine confidence in Pardo's convictions and death sentences for several reasons. First, the defense investigation and three-day deposition of Ribera revealed ample evidence that he was a liar whose testimony should not be taken at face value. Second, defense counsel testified only that he might have used the videotapes to impeach Ribera, depending on the circumstances. Third, Pardo testified in the guilt phase that he committed each of the murders, negating any prejudice. Finally, the defense at trial was insanity, an affirmative defense that admits the acts alleged. We agree that although the State suppressed potentially favorable evidence in failing to disclose the videotapes, the record conclusively demonstrates that judicial confidence in the verdict is not undermined by the nondisclosure.
To establish a Brady violation, a defendant must prove (1) that evidence favorable to the accused because it is exculpatory or impeaching, (2) was suppressed by the State, either willfully or inadvertently, (3) resulting in prejudice to the defense. Way v. State, 760 So.2d 903, 910 (Fla.2000). The determination whether *1066 a Brady violation has occurred is subject to independent appellate review. Id. at 913; Cardona v. State, 826 So.2d 968, 973 (Fla.2002). Prejudice under a Brady claim, like an ineffective assistance claim, is established if the nondisclosure undermines confidence in the conviction. Id.
In this case, the State stipulated below that it failed to disclose to defense counsel the videotapes of the May 6, 1986, police interview of Ribera, establishing the second prong of Brady. The evidentiary hearing and trial court ruling centered on whether the videotapes were impeaching and whether they put the entire case in such a different light as to undermine confidence in the convictions.
Before we address Pardo's specific arguments on this issue, we distinguish this case from the case of Pardo's codefendant, in which we ruled that the nondisclosure of the Ribera videotapes required a new trial. See Garcia v. State, 816 So.2d 554 (Fla.2002). Pardo's trial testimony admitting the killings places the nondisclosure in a far less prejudicial light than in Garcia's case. In fact, the exclusion of Pardo's testimony provided a second basis for reversal of Garcia's convictions. Id. at 567. Other evidence also strongly implicated Pardo. The State introduced evidence that a projectile removed from Pardo's foot was fired from one of the two guns used to kill Ramon Alvero and Daisy Ricard. In addition, the State produced evidence that a spent casing from Pardo's closet was fired from the same gun as a casing found under Alvero's body. Also, blood and bullets in Pardo's car connected him to the murder of Millot. Finally, police found in Pardo's apartment a diary with Pardo's handwriting and newspaper clippings pointing to the murders. In contrast, little physical evidence linked Garcia to the murders. Id. at 563. Accordingly, the reversal in Garcia does not compel the same result here.
Nonetheless, Pardo asserts that access to the videotapes of the eight-hour interview with Ribera would have altered the course of Pardo's trial in several ways, undermining confidence in the outcome. Pardo asserts that (1) defense counsel would have been able to successfully move to suppress the evidence acquired during execution of a search warrant at Pardo's home which relied upon Ribera's information for probable cause; (2) counsel could have impeached Ribera with greater success at trial, eliminating Pardo's motivation to testify and admit the killings; and (3) counsel could have better prepared for trial and adopted different strategies, perhaps forgoing the decision to rely on a defense of insanity.

A. Suppression of Evidence
Ribera was the confidential source identified in the affidavit filed with the application for a warrant to search Pardo's residence. Ribera's statements under polygraph examination and verification of some of the information he provided that was not released to the public were the primary sources of probable cause. Pardo claims that the material in the videotapes would have portrayed Ribera as so unreliable that trial counsel would have successfully moved to suppress the fruits of the search.
Initially, we are skeptical of the claim that nondisclosure of material bearing on the reliability of a search warrant is impeachment material cognizable under Brady. Impeachment is an attack on the credibility of a witness. See § 90.608, Fla. Stat. (2005). The validity of an affidavit for a search warrant is determined not from witness testimony but from the four corners of the affidavit. Pagan v. State, 830 So.2d 792, 806 (Fla.2002). If the affidavit creates a substantial basis *1067 for a finding of probable cause on its face, a defendant seeking to suppress the fruits of the warrant must establish that the affidavit contains statements that were intentionally false or made with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); Thorp v. State, 777 So.2d 385, 391 (Fla.2000). In the alternative, the defendant must demonstrate that the affidavit omits facts with intent to deceive or with reckless disregard for whether the information should have been revealed to the magistrate. Pagan, 830 So.2d at 807. If probable cause does not exist after excising such falsehoods or adding the material omitted, evidence acquired thereby must be suppressed. Thus, falsehoods and omissions from an affidavit used to obtain a search warrant can invalidate the initial probable cause determination, but they are not impeachment material in the sense of facts bearing on the credibility of a testifying witness.
We need not decide whether the nondisclosure of evidence bearing on the validity of a search warrant is cognizable under Brady because the nondisclosure of the Ribera videotapes did not result in prejudice warranting a new trial. A determination of prejudice would require us to conclude first that trial counsel probably would have used the information in the videotapes to file a motion to suppress, second that the motion would have been granted and crucial evidence suppressed, and third that confidence in Pardo's convictions is undermined. On the record before us, we cannot reach this ultimate conclusion.
Trial counsel Guralnick stated at the evidentiary hearing that he might have been able to use the videotapes to show that the police officer interviewing Ribera did not believe him and that some of Ribera's knowledge of the crimes came from media accounts of one of the murders. However, Guralnick did not review the videotapes before the evidentiary hearing and thus could not state that the videotapes would have led him to seek suppression of the fruits of the search warrant. Nor did postconviction counsel make a showing that the videotapes would or should have led trial counsel to seek suppression of the evidence obtained via the warrant. Pardo has not identified in the videotapes any falsehoods or omissions of the magnitude identified in Franks and Pagan. Thus he has not established that had the videotapes been disclosed, a motion to suppress probably would have been filed.
Second, there is no basis to conclude that a motion to suppress based on the videotapes would have been granted. As stated above, none of the material in the search warrant affidavit meets the standard of materiality set out in Franks and Paganintentional or reckless falsehoods or omissions. Pardo cites no authority requiring that all of the information supplied by a source be excised because the source is generally unreliable, which would be contrary to the focus of the Franks test on specific falsehoods and omissions. Further, the affidavit did not rest solely on information provided by Ribera. There was also corroboration of some of the details attributed to Ribera. Cf. State v. Butler, 655 So.2d 1123, 1127 (Fla.1995) (noting that the United States Supreme Court has repeatedly relied on relevant corroborating facts known by the police in evaluating an informant's tip as the primary basis for probable cause). On the whole, we find no reasonable probability that had the videotapes been provided to defense counsel, evidence acquired in the search of Pardo's home would have been ruled inadmissible in Pardo's trial.
*1068 The final consideration is whether, assuming disclosure of the Ribera videotapes would have led to suppression of the fruits of the search, the suppression would render Pardo's murder convictions and death sentences unreliable. This requires an assessment of the weight of both the evidence seized pursuant to the warrant and the other evidence introduced by the State. Evidence taken from Pardo's apartment pursuant to the search warrant and introduced at trial included a diary and newspaper clippings that tied him to many of the murders. However, the State also introduced ample evidence unrelated to either the search or the portions of Ribera's trial testimony that were uncorroborated. For example, a bullet removed from Pardo's foot matched projectiles used in the murders of Ramon Alvero and Daisy Ricard. Pardo's fingerprint was found on the wrist-watch of victim Ricard, discovered next to her body. Further, the palm print of codefendant Garcia was on a pawn slip for jewelry belonging to victims Musa and Quintero, pawned the day after their murders. In addition, Garcia used credit cards belonging to several victims after their murders. Finally, much of the physical evidence corroborated Ribera's testimony as to what he had seen and heard.
The primary reason exclusion of the items seized from Pardo's apartment would not undermine confidence in the outcome is that Pardo insisted on testifying that he personally killed all of the nine victims because they were drug dealers. At that point only Pardo's sanity remained in question, and the jury in returning guilty verdicts rejected the insanity defense. The assertion by postconviction counsel that Pardo would not have testified had the videotapes been disclosed and the evidence suppressed is unsupported speculation. Pardo's chief motivation in testifying was to claim credit for the vigilante killings and refute the State's suggestion through Ribera that Pardo was a drug dealer. Pardo's reason for testifying appears unrelated to the incriminating nature of the evidence seized in the search of his apartment. This aspect of Pardo's postconviction claim is addressed in greater detail below.

B. Impeachment of Witness at Trial
Ribera's trial testimony incriminated Pardo in all nine murders. Ribera testified that Pardo described how he had killed many of the victims and showed Ribera diary entries, newspaper clippings, and Polaroid photographs substantiating his claims. Ribera also testified that Garcia, Pardo's codefendant, told him how Pardo had killed victims Musa and Quintero.
Postconviction counsel has identified a number of statements in the videotapes which trial counsel could have used to impeach Ribera. However, none of these statements, individually or collectively, undermine confidence in the outcome of the proceedings.
Initially, as noted by the State, on close inspection several of Ribera's statements, on trivial as well as material facts, are not inconsistent with his trial testimony. Alleged inconsistencies about when Ribera was shown photographs of the murder scenes by Pardo, whether he was allowed in Pardo's home, and where he had seen credit cards belonging to the victims are not borne out by the record. Of greater significance, the videotaped statements are not inconsistent with Ribera's trial testimony that Garcia and Pardo played separate roles in their joint enterprise. In the police interview, Ribera described Pardo as the "killing machine" and Garcia as the brains of the drug dealing who, nonetheless, would not do anything without Pardo's approval. In his trial testimony, Ribera clearly identified Pardo as the one who *1069 killed the victims and Garcia as the one who depicted the killings as robberies of drug dealers.
In sum, even without consideration of the additional evidence against Pardo, there are no inconsistencies in the videotapes of Ribera's police interview that put the case in such a different light as to undermine judicial confidence in the verdict. Nor, assuming trial counsel could expose the jury to evidence of coaching during the interview or indications that Ribera was suffering from a drug hangover, as Pardo alleges, would confidence be undermined. Ribera admitted during cross-examination that he had been a guntoting drug dealer at the time of his interactions with Pardo and Garcia.
The diary, newspaper clippings, and ballistics and serology evidence against Pardo, discussed above, buttress our conclusion that material in the videotapes does not undermine confidence in the verdicts. As trial counsel Guralnick testified during the evidentiary hearing, "[r]easonable doubt was certainly not viable in this particular case." Pardo does not press a theory of innocence supported by the undisclosed impeachment material other than the general reasonable doubt theory rejected by trial counsel. As noted above, Pardo's jury confession also serves to distinguish this case from that of his codefendant Garcia on the effect of the nondisclosure of the Ribera videotapes.[4] Pardo's in-court confession in his own trial negates any prejudice from the nondisclosure of the Ribera videotapes.
The claim by postconviction counsel that Pardo would not have testified had Ribera been impeached with the videotapes is addressed below.

C. Defense Preparation and Strategy
Pardo argues that disclosure of the Ribera videotapes would have changed the defense's investigation and planning for the trial and enabled defense counsel to successfully discourage Pardo from testifying and admitting that he committed the murders. These assertions are highly speculative. Pardo has not established that, given the physical and testimonial evidence against him, the Ribera videotapes would have materially changed trial counsel's preparations or the course of the trial. Further, the claim of postconviction counsel that Pardo took the witness stand to rebut Ribera's testimony on Pardo's role in the killings is contrary to Pardo's own testimony. Pardo sharply challenged Ribera's testimony that Pardo benefited financially from the murders, but did not contest Ribera's testimony in general or his implication of Pardo in the nine murders in particular. Ribera testified that Pardo killed Amador and Alfonso "to rip them off and get the cocaine and sell it for money," killed Robledo and Ledo "to rip them off for two or three kilos of cocaine," and killed Musa and Quintero for $50 and "respect." On cross-examination, the following exchange occurred:
Q He [Pardo] was proud of killing these people, wasn't he?
A He was making money.
In his testimony, Pardo explained why he chose to testify, against his lawyer's advice:

*1070 Q Why is it so important for you to have these ladies and gentlemen hear your version of the story?
A Because what Carlo Ribera said was self-serving and is completely wrong and I want my opportunity to tell my side of the story.
Q Mr. Pardo, both Mr. Waskman and Ms. Weintraub [the prosecutors] have tried to make special note that you killed these people because you were a drug dealer and that you were involved in drug trafficking.
. . .
A I applaud the State Attorney's Office in the preparation of their case. It was flawless, it was beautiful with the minor exception of why I killed these people.
At no time did anybody indicate I was a drug dealer. At no time in my life have I ever been a drug dealer. . . .
. . .
Q Have you been involved in drug transactions with any of the victims in this case?
A Not drug transactions to benefit myself, no.
Q You admit to killing all of the nine people that they have set forth in this trial?
A Yes, I do, of course I did.
Q Mr. Pardo, why did you kill these people, and I don't mean one, I mean each and every one?
Q I killed each and every one of these people because they were drug dealers.
As stated above, Pardo maintained that he was not guilty of murder because he considered his victims to be drug dealers who had forfeited the right to live. He did not testify at the postconviction evidentiary hearing to support postconviction counsel's assertion that he would not have taken the witness stand at trial had Ribera been discredited through his statements in the police videotapes. Therefore, we find no reasonable probability that disclosure of the videotapes of the Ribera interview would have altered the investigation, preparation, or presentation of the defense's case, and certainly not to a level undermining confidence in the convictions. Accordingly, we affirm the denial of relief on this claim.

IV. Waiver of Severance of Counts
Pardo asserted below that trial counsel was ineffective in waiving a severance of the various murder, robbery, and weapons counts into two or more trials. Relying on the testimony of trial counsel during the evidentiary hearing, the trial court concluded that counsel acted reasonably when he opted to seek an acquittal on the defense of insanity in a single trial rather than attempt to win acquittal in each of a series of trials. In his appeal of the denial of relief on this claim, Pardo asserts that trial counsel's actual reason for forgoing severance was financial: counsel could not afford to represent Pardo in numerous trials on what he had been paid. In support of this contention, Pardo points to an unfiled motion to withdraw claiming financial hardship taken from counsel's files. Pardo also asserts that trial counsel did not testify that "[t]he jury would be more likely to believe an insanity defense, given the number of victims," as the trial court found. The State responds that trial counsel's strategy was reasonable under the circumstances, that the trial court recognized at the time of trial that the strategy was sound, and that the defense expert who testified for Pardo at trial supported the view that trying the nine murder counts together buttressed the prospects of success on the insanity defense.
"[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered *1071 and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). In opting to try all of the counts against his client in a single proceeding, defense counsel made a reasonable strategic decision involving an informed choice among alternatives. The record reflects that at the point when counsel moved to try the counts together, Pardo's trial had been severed from that of codefendant Garcia, and counts IX through XIII involving the Musa and Quintero murders were severed from the other counts against Pardo. However, during jury selection for the first trial on six of the murders, trial counsel changed his position and agreed that counts IX through XIII, as well as the counts involving the murder of Michael Millot charged in a separate indictment, should also be included. The trial court granted the motion, observing that "in view of his defense, he feels, obviously, and I can see why, it [is] best to try his client on all counts." Later, in response to the State's expression of concern that Pardo may not have agreed with counsel's decision, the trial judge noted that he had seen counsel consult with Pardo. Guralnick confirmed that he had consulted with Pardo.
In his testimony at the postconviction evidentiary hearing, trial counsel Guralnick explained his rationale for agreeing to a single trial on all counts:
All of the separate counts of murder that had been filed against him, if I had tried each of them individually, I mean, his chances of winning every single one of them with the evidence that they had, you would have had a better shot at winning the lottery. So it was my opinion that with an insanity defense, if they're all joined in one case, that if the jury believed that he was insane, then he was a total winner.
The trial court instructed the jury that "[a] person is considered insane when he has a mental infirmity or disease or defect and because of this condition, he did not know what he was doing or its consequences or although he knew what he was doing or the consequences, he did not know it was wrong." Dr. Marquit's testimony supported the defense's insanity theory on the rationale that Pardo did not think it was wrong to kill those he considered to be drug dealers. Counsel reasonably could have concluded that the large number of victims demonstrated the sincerity of this belief and thus the credibility of the insanity defense.
Pardo's own testimony reinforced the decision to try all of the murder counts together to support the insanity defense. He proudly acknowledged killing all nine victims and opined that his acts were not murders because his victims were drug-dealing parasites rather than human beings. In the postconviction evidentiary hearing, trial counsel stated that although he had advised Pardo not to testify, he came to believe it might have been a good move because Pardo sounded "crazier than a bed bug."
Apart from the unfiled motion to withdraw, there is no support in the record for the allegation that counsel tried all the counts together for financial reasons. As the State points out, fifteen months elapsed between the date of the unfiled motion to withdraw and counsel's decision to seek a single trial on all counts. Asked at the evidentiary hearing whether something had changed in the interim, counsel stated that it had, but did not elaborate. Although the trial record does not reveal a ruling on the pretrial motion for appointment as a special assistant public defender filed by Guralnick, several motions for expenses in the record reflect that Pardo had been declared indigent for purposes of *1072 costs. The suggestion of an ulterior motive for trial counsel's strategy is without adequate record support.
Accordingly, Pardo has not demonstrated deficient performance under the Strickland standard. Further, there is no indication of prejudice sufficient to overturn the verdicts for any of the five murderous episodes. This Court's decisions in the direct appeals by Pardo and Garcia establish that the counts were severable. See Garcia, 568 So.2d at 899-901 (reversing conviction for failure to sever trials by episode); Pardo, 563 So.2d at 80 (noting that each episode of killing "was singular, discrete, and only tenuously related, if at all, to the other episodes"). However, even in the event of severance, Pardo has not shown a reasonable probability, sufficient to undermine confidence in the outcome, of a different result in any of the severed trials. Even without Pardo's jury confession, the physical and testimonial evidence against Pardo was strong, as trial counsel acknowledged in the evidentiary hearing when he stated that he went with the insanity defense because of the overwhelming evidence of guilt and compared the prospect of acquittal to winning the lottery.
Having failed to satisfy either prong of a meritorious ineffective assistance claim, Pardo is not entitled to relief on his assertion that trial counsel failed to perform as the counsel guaranteed by the Sixth Amendment. We affirm the trial court's denial of relief on this claim.

PETITION FOR WRIT OF HABEAS CORPUS
In his habeas petition, Pardo asserts that appellate counsel was ineffective in failing to raise several issues in Pardo's direct appeal: that the trial court erred in precluding cross-examination of Ribera on prior crimes he admitted committing but was not charged with, and that the trial court erred in its rulings on several evidentiary issues preserved by trial counsel.
This Court's standard for evaluating claims of ineffective assistance of appellate counsel in habeas corpus proceedings mirrors the standard set out in Strickland for trial counsel ineffectiveness. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). This Court said in Rutherford:
[T]his Court's ability to grant habeas relief on the basis of appellate counsel's ineffectiveness is limited to those situations where the petitioner establishes first, that appellate counsel's performance was deficient because "the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and second, that the petitioner was prejudiced because appellate counsel's deficiency "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result."
Id. (quoting Thompson v. State, 759 So.2d 650, 660 (Fla.2000)).
Addressing a claim that appellate counsel was ineffective in failing to contest trial court rulings on evidentiary issues, this Court has stated:
With regard to evidentiary objections which trial counsel made during the trial and which appellate counsel did not raise on direct appeal, this Court evaluates the prejudice or second prong of the Strickland test first. In doing so, we begin our review of the prejudice prong by examining the specific objection made by trial counsel for harmful error. A successful petition must demonstrate that the erroneous ruling prejudiced the petitioner.
Jones v. Moore, 794 So.2d 579, 583 (Fla.2001). In Strickland, the United States Supreme Court stated that if the defendant cannot establish one prong of an ineffective *1073 assistance claim, the court need not address the other. 466 U.S. at 697, 104 S.Ct. 2052. Accordingly, in Valle v. Moore, 837 So.2d 905, 910-11 (Fla.2002), this Court denied a claim of ineffective assistance of appellate counsel upon concluding that no prejudice ensued from the lack of an appellate challenge to the admission of a gun because the ruling, if error, was harmless.[5]
Such is the case here. Our confidence in the verdicts of guilt and sentences of death would not be undermined had appellate counsel successfully raised each of the issues specified by postconviction counsel. Both individually and cumulatively, the errors would have been harmless beyond a reasonable doubt. As detailed above, the jury received evidence of highly incriminating notations in Pardo's diary and possession of newspaper clippings, ballistics and blood evidence linking Pardo to many of the murders, and Ribera's testimony that Pardo boasted about most of the killings. Further, none of the evidentiary rulings specified in this claim undermine the force of Pardo's confession to the jury that he intentionally killed each of the nine victims. Accordingly, Pardo was not prejudiced by appellate counsel's failure to raise issues concerning evidentiary rulings that were harmless beyond a reasonable doubt.
Finally, Pardo claims appellate counsel was ineffective in failing to ensure a complete record. He is not entitled to relief because he has not identified any errors occurring during the proceedings that were not transcribed. See Griffin v. State, 866 So.2d 1, 21 (Fla.2003) (denying habeas relief to petitioner who "has not pointed to any errors that occurred during the portions of the proceedings that were not transcribed"); Ferguson v. Singletary, 632 So.2d 53, 58 (Fla.1993) (rejecting claim of ineffective assistance of appellate counsel based on missing record because the defendant "point[ed] to no specific error which occurred"). Accordingly, we reject this claim as well.

CONCLUSION
Having found no reversible error in the trial court's denial of Pardo's motion for postconviction relief, we affirm its ruling. Having found no merit in the points raised in Pardo's habeas petition, we deny the petition.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The issues raised in Pardo's 3.850 motion concerned (1) the trial court's denial of public records requests; (2) matters relating to trial that Pardo claims denied him an "adversarial testing," specifically (a) an alleged conflict of interest by trial counsel, (b) the State's withholding of videotapes of a police interview with State witness Carlo Ribera, (c) trial counsel's failure to seek suppression of evidence from search warrants, (d) trial counsel's failure to seek severance of some of the first-degree murder counts, (e) trial counsel's introduction of evidence that Pardo identified with Adolph Hitler, collected Nazi memorabilia, and said he worshipped the devil, (f) undisclosed and newly discovered evidence concerning the lead detective in the case, (g) trial counsel's failure to adequately investigate and challenge Pardo's guilt on two of the murders, (h) trial counsel's failure to request a competency determination, (i) trial counsel's failure to request a change of venue, and (j) trial counsel's failure to investigate the underlying medical cause of Pardo's alleged insanity and incompetence; (3) Pardo's competence to stand trial; (4) the adequacy of evaluations by mental health professionals who examined Pardo regarding his insanity defense; (5) prohibitions on juror interviews; (6) the propriety of the state's closing argument and defense counsel's failure to object to it; (7) limitation of cross-examination of Carlo Ribera; (8) alleged error under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (9) various attacks on the constitutionality of the death sentences; (10) the adequacy of instructions on aggravating circumstances; and (11) alleged cumulative error.
[2] The supplement concerned (1) the constitutionality of the death sentences under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (2) newly discovered evidence of Garcia's plea bargain on four murders after being acquitted of a fifth; and (3) nondisclosure of Garcia's plea agreement.
[3] Pardo also appeals the denial of his public records requests. Having carefully considered the arguments of the parties on this claim, we conclude that Pardo has not been denied his constitutional or statutory rights to public records, and affirm on this issue without further discussion.
[4] Garcia's first set of four first-degree murder convictions was reversed because the offenses were erroneously consolidated for trial. Garcia v. State, 568 So.2d 896, 901 (Fla.1990). On remand, Garcia was convicted of two counts of first-degree murder and again sentenced to death. We reversed on two grounds: the nondisclosure of the Ribera videotapes and the exclusion of Pardo's testimony taking sole responsibility for the murders in his trial, each resulting in harmful error. 816 So.2d at 560-67.
[5] We have cautioned trial courts conducting evidentiary hearings on ineffective assistance claims that addressing only one of the Strickland prongs risks avoidable delay and duplication of effort if the court's ruling on that prong is overturned. See Henry v. State, 937 So.2d 563, 568-69 (Fla. 2006); Grosvenor v. State, 874 So.2d 1176, 1182-83 (Fla.2004). These concerns do not have the same force on appellate ineffectiveness claims, which do not involve evidentiary hearings.