DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MARTIN J. ZARCADOOLAS**,
Appellant,

v.

**GREGORY TONY,** as Sheriff of Broward County,
Appellee.

No. 4D21-2227

[January 4, 2023]

Appeal of a nonfinal order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Nicholas Richard Lopane, Judge; L.T. Case No. CACE21-009212.

Howard M. Srebnick, Benjamin S. Waxman, and Jeanelle Gomez of Black Srebnick, P.A., Miami, for appellant.

Kristin Mackenzie, Assistant General Counsel, Broward County Sheriff's Office, Fort Lauderdale, for appellee.

PER CURIAM.

This nonfinal appeal arises from a civil forfeiture action filed by the Broward County Sheriff's Office ("BSO") pursuant to the Florida Contraband Forfeiture Act, sections 932.701–.7062, Florida Statutes (2020) ("the Forfeiture Act"). The property at issue includes seized bank accounts owned by appellant Martin Zarcadoolas and his company as well as items that were seized from Zarcadoolas's home pursuant to a search warrant.

Zarcadoolas appeals two orders: (1) an order denying his motion to suppress evidence of items seized following a search of his home, and (2) an order finding probable cause under the Forfeiture Act for the continued seizure of those items and the seized bank accounts. We reverse both orders and remand with instructions to order BSO to return the property to Zarcadoolas.

## Background

In December 2018, BSO received an anonymous tip stating that an organization based primarily in Broward County was engaged in illegal gambling, bookmaking, and money laundering activity. In March 2019, BSO received

another anonymous tip providing more information about the organization's activities.

The organization allegedly used offshore websites to take high-dollar bets on various sporting events, collected its proceeds in cash, and then laundered the cash in various ways. BSO investigated the organization from December 2018 through March 2021, and allegedly developed probable cause to believe that Zarcadoolas was one of its members.

In April 2021, Agent W of the Palm Beach County Sheriff's Office ("PBSO") applied to a circuit court judge in Palm Beach County for a warrant to search Zarcadoolas's home, which was located in Palm Beach County. Agent W was the only officer who signed the affidavit in support of the search warrant. In the affidavit, Agent W stated that he had probable cause to believe that Zarcadoolas and other members of the organization had committed racketeering, bookmaking, and money laundering offenses and that evidence relevant to proving those offenses would be found in Zarcadoolas's home.

Agent W stated in the affidavit that his training and experience was in road patrol, SWAT operations, and narcotics investigations. Nonetheless, the affidavit declared that Agent W relied on his "training and experience" to interpret certain observations as evidence of bookmaking and money laundering activity. The affidavit also relied heavily on information and communications obtained from "confidential, reliable sources," which were later revealed to be wiretapped conversations, in addition to the information obtained from the anonymous tipsters.

Agent W's affidavit reflected that BSO first learned about Zarcadoolas in January 2020 and investigated him closely from August 2020 through November 2020. The affidavit contained detailed observations from that timeframe and alleged that Zarcadoolas's conduct was in furtherance of the organization's bookmaking and money laundering activities. The only post-November 2020 observations were that Zarcadoolas communicated with two other alleged members of the organization in February and March 2021 and met with an alleged associate of the organization in late March 2021. The affidavit did not reflect the content of the communications or the purpose of the meeting, nor did it allege that any of Zarcadoolas's conduct after November 2020 was in furtherance of the organization's criminal activities.

Upon review of the affidavit, the judge authorized the search warrant for Zarcadoolas's home. PBSO executed the warrant and seized, among other items, $196,733 in cash, gold coins valued collectively at $44,400, and $9,000 in casino chips. On the same day, PBSO executed seizure warrants on two bank accounts: a Bank of America account owned by Zarcadoolas with a balance of $165,412.41,

and a Chase Bank account owned by Zarcadoolas's company, MZ Solutions, LLC, with a balance of $598,904.81.[1]

Two days later, BSO notified Zarcadoolas that it was seizing the funds in the two bank accounts, as well as the cash, gold coins, and casino chips that were seized from his home, pursuant to the Forfeiture Act. A circuit court judge in Broward County made an initial finding that probable cause existed for the seizure of the property as "monetary instruments" under section 932.703(1)(a)5. and "contraband articles" under sections 932.701(2)(a)2. and 932.701(2)(a)5. *See* § 932.703(2), Fla. Stat. (2020). BSO then filed a verified complaint for forfeiture of the property. To date, no criminal charges have been filed against Zarcadoolas.

Zarcadoolas requested an adversarial preliminary hearing to determine whether the continued seizure of the property was supported by probable cause to believe that it had been or was being used in violation of the Forfeiture Act. *See* § 932.703(3)(a), Fla. Stat. (2020). He also moved to suppress the items that were seized from his home pursuant to the search warrant, arguing primarily that the affidavit did not establish probable cause to believe that evidence of racketeering, bookmaking, or money laundering offenses would be found in his home.

The testimony at the adversarial preliminary hearing established that Agent W was not the true author of the affidavit in support of the search warrant. The affidavit was actually drafted by BSO Detective F. This detective asked Agent W to co-sign the affidavit for jurisdictional purposes only, because Zarcadoolas's home was in Palm Beach County. But Detective F was unable to sign the affidavit because of a computer problem, so it was submitted with only Agent W's signature. The references in the affidavit to "the affiant" or the affiant's "training and experience" were intended to refer to Detective F. The sole affiant identified on the affidavit, Agent W, did not have any personal knowledge of the investigation, did not listen to any of the wiretapped conversations or have direct contact with any of the other sources cited in the affidavit, and did not have any training or experience in bookmaking or money laundering investigations.

A different BSO detective, Detective B, submitted an affidavit and testified in support of probable cause for the continued seizure of the property under the Forfeiture Act. Detective B expressed his belief that Zarcadoolas was using his company, MZ Solutions, as a "front" to launder the proceeds from the organization's bookmaking activity. He testified that the Chase Bank account, which was owned by MZ Solutions, had an unusually high number of deposits and withdrawals in whole-number increments. He also testified that Zarcadoolas often transferred money from the Chase Bank account to his personal Bank of America account, and he believed that those transfers were a

---

[1] Zarcadoolas has not challenged the bank accounts' seizure warrants.

"layering" step in the money laundering process. But he conceded that although the organization's bookmaking activity was alleged to have been conducted mostly in cash, almost all of the funds in the Chase Bank and Bank of America accounts actually came from noncash sources. He admitted that he could not identify any specific deposits to either bank account that could have been cash proceeds from the organization's alleged bookmaking activity.

Zarcadoolas presented testimony from a forensic accountant, who confirmed that almost all of the funds in the Chase Bank and Bank of America accounts came from noncash sources. He testified that most of the deposits to the Chase Bank account were direct deposits from two companies in which Zarcadoolas and MZ Solutions had ownership interests. Only one cash deposit of $2,500 was made to the account during the time frame that BSO alleged Zarcadoolas was laundering the organization's money. As to the Bank of America account, most of the deposits were transfers from the Chase Bank account. Only one cash deposit of $32,700 was made to the account during the relevant time frame, and Zarcadoolas had won legal gambling proceeds of about $40,000 in cash around the time that deposit was made. The accountant also testified that, because Zarcadoolas was MZ Solutions' sole member, his transferring money from the company's Chase Bank account to his personal Bank of America account was not improper or unusual.

Detective B testified in rebuttal that he believed the two companies which were the primary sources of the funds in the Chase Bank account were part of the organization's money laundering scheme. But he conceded that he could not identify any specific deposits to either company's bank accounts that could have been cash proceeds from the organization's alleged bookmaking activity.

After the hearing, Zarcadoolas filed a supplemental motion to suppress, arguing the hearing testimony established that the affidavit contained materially false statements about Agent W's role in the investigation.

The court denied Zarcadoolas's motion to suppress the items that were seized from his home pursuant to the search warrant. As to whether BSO had probable cause under the Forfeiture Act to support the continued seizure of those items as well as the two seized bank accounts, the court initially suggested that Zarcadoolas lacked standing because he did not present sworn proof of a possessory or ownership interest in the property. But the court ultimately ruled on the merits that there was probable cause under the Forfeiture Act to support the continued seizure of the property.

Zarcadoolas timely appealed both orders.[2]

---

[2] The order finding probable cause under the Forfeiture Act for the continued seizure of the property is appealable because it determines "the right to immediate possession of property." Fla. R. App. P. 9.130(a)(3)(C)(ii). The scope of the appeal includes the order

4

**Analysis**

We address two distinct but related issues in this opinion: (1) whether the trial court erred in denying Zarcadoolas's motion to suppress the items that were seized from his home pursuant to the search warrant, either because the affidavit on its face failed to establish probable cause for the search or because the affidavit contained false statements without which probable cause could not have been established; and (2) whether the court erred in finding probable cause under the Forfeiture Act for the continued seizure of the two seized bank accounts and the items that were seized from Zarcadoolas's home.

## I. Motion to Suppress

We first address whether the trial court erred in denying Zarcadoolas's motion to suppress the items that were seized from his home pursuant to the search warrant—the cash, the gold coins, and the casino chips.

Zarcadoolas raises two main arguments: first, the affidavit in support of the search warrant was insufficient to establish probable cause; and second, even if the affidavit had been sufficient on its face, the testimony at the adversarial preliminary hearing revealed that it contained materially false statements about Agent W's role in the investigation.  We agree with Zarcadoolas on both issues.

### A. Insufficiency of the Affidavit

To establish probable cause for a search warrant, the supporting affidavit must demonstrate a reasonable probability, based on the totality of the circumstances, that evidence of a crime will be found at the place to be searched at the time of the search.  *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002). Whether probable cause exists must be determined from the four corners of the affidavit.  *Id.*; *Pardo v. State*, 941 So. 2d 1057, 1066 (Fla. 2006).  The trial court's determination of probable cause is a legal issue subject to *de novo* review.  *Pagan*, 830 So. 2d at 806.

The affidavit in this case was insufficient to establish probable cause for three main reasons.  First, the affidavit arguably indicated on its face that Agent W did not have the necessary training and experience to evaluate the results of the investigation and develop probable cause to believe that evidence of racketeering,

---

denying the motion to suppress because Fourth Amendment issues are "inextricably bound up with" determinations of probable cause under the Forfeiture Act.  *Indialantic Police Dep't v. Zimmerman*, 677 So. 2d 1307, 1309 (Fla. 5th DCA 1996); *see also Toussaint v. City of Fort Lauderdale*, 215 So. 3d 602, 603 (Fla. 4th DCA 2017) (evidence obtained in violation of the Fourth Amendment must be excluded from a determination of probable cause under the Forfeiture Act).

bookmaking, and money laundering offenses would be found in Zarcadoolas's home. The affidavit stated that Agent W's training and experience was in road patrol, SWAT operations, and narcotics investigations—not racketeering, bookmaking, or money laundering investigations. But, at the same time, the affidavit reflected that Agent W relied heavily on his "training and experience" to interpret certain observations and communications, most of which would have otherwise seemed innocuous, as evidence of bookmaking and money laundering activity.

Second, the affidavit relied on anonymous tips and "confidential, reliable sources" without demonstrating any basis to conclude that those sources were knowledgeable and reliable. *See Franks v. Delaware*, 438 U.S. 154, 165 (1978) (if an affidavit relies on information from an anonymous or confidential informant to establish probable cause, it must recite "some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered" and "some of the underlying circumstances from which the officer concluded that the informant . . . was credible or his information reliable") (internal quotations omitted)); *Pagan*, 830 So. 2d at 806 (an affidavit "must state that the affiant has personal knowledge of the confidential informant's veracity" or "must contain sufficient independent corroborating evidence").

As to the anonymous tips, the affidavit did not explain the basis for the tipsters' knowledge or demonstrate that the tips were reliable because they contained predictive information that was later corroborated. *See Florida v. J.L.*, 529 U.S. 266, 270–71 (2000). As to the "confidential, reliable sources" cited throughout the affidavit, testimony at the adversarial preliminary hearing revealed that those "sources" were wiretapped conversations, but that fact was not apparent on the face of the affidavit. *See Pardo*, 941 So. 2d at 1066 (probable cause must be determined "not from witness testimony but from the four corners of the affidavit").

Third, and finally, the allegations in the affidavit were too stale to establish probable cause to believe that evidence of racketeering, bookmaking, and money laundering offenses would be found in Zarcadoolas's home at the time of the search. *See Pagan*, 830 So. 2d at 806 (requiring a reasonable probability that evidence of a crime will be found "at a particular place *and time*" (emphasis added)); *Cruz v. State*, 788 So. 2d 375, 379 (Fla. 4th DCA 2001) ("the passage of time is an important factor in support of the existence of probable cause"); *see also Rodriguez v. State*, 297 So. 2d 15, 18 (Fla. 1974) (recognizing a 30-day "rule of thumb" for staleness absent a showing of "extraordinary circumstances").

The affidavit reflected that BSO investigated Zarcadoolas closely from August 2020 through November 2020. But left unexplained was a lapse in the investigation between November 2020 and February 2021. After this lapse, the affidavit alleged only that Zarcadoolas communicated and met with alleged

members and associates of the organization in February and March 2021. Agent W did not apply for the search warrant until mid-April 2021. The affidavit did not explain or justify the gap of more than four months between the last real allegation of criminal activity—in November 2020—and the time Agent W applied for the search warrant—in April 2021. The affidavit also did not reveal the substance or purpose of Zarcadoolas's communications and meetings with alleged members and associates of the organization in February and March 2021 or set forth any evidence that the organization's criminal activity was ongoing at that time. *See Cruz*, 788 So. 2d at 378–79 (evidence of a "pattern of ongoing criminal activity" may overcome an argument that the allegations in an affidavit are too stale to establish probable cause). In short, the affidavit did not demonstrate any reasonable basis to believe that evidence of the organization's criminal activity would be found in Zarcadoolas's home at the time of the search.

In summary, based on the totality of the circumstances, we conclude that the affidavit in this case was insufficient on its face to establish probable cause for the search warrant.

## B. False Statements in the Affidavit

Alternatively, even if the affidavit had been sufficient on its face to establish probable cause for the search warrant, we agree with Zarcadoolas that the testimony at the adversarial preliminary hearing demonstrated the affidavit contained false statements or omissions about Agent W's role in the investigation, without which probable cause could not have been established.

Evidence seized pursuant to a search warrant must be suppressed if it is established at an evidentiary hearing that (1) the affidavit in support of the search warrant contained false statements made knowingly and intentionally or with reckless disregard for the truth, or omitted facts with intent to deceive or with reckless disregard for whether the facts should have been revealed, and (2) the false statements were necessary to the finding of probable cause, or the omitted facts would have defeated the finding of probable cause. *See Franks*, 438 U.S. at 155–56; *Pardo*, 941 So. 2d at 1066–67; *Pagan*, 830 So. 2d at 807; *Johnson v. State*, 660 So. 2d 648, 655–56 (Fla. 1995).

The affidavit in this case, as submitted to the Palm Beach County judge, was signed only by Agent W. The affidavit was written as if Agent W had been directly involved in the investigation and had the necessary training and experience to evaluate the results of the investigation and develop probable cause to justify the search of Zarcadoolas's home.

But the testimony at the adversarial preliminary hearing revealed that Agent W did not actually contribute to the drafting of the affidavit. Detective F wrote the affidavit, referring to her own training, experience, and involvement in the investigation. Agent W was meant to co-sign the affidavit for jurisdictional

7

purposes only. Contrary to the affidavit's express and implied statements, Agent W was not personally involved in the investigation, did not observe any of the evidence or listen to any of the wiretapped conversations cited in the affidavit, and did not have any training or experience in bookmaking or money laundering investigations. These facts were not revealed to the judge when Agent W submitted the affidavit in support of his application for a search warrant.

These false statements or omissions regarding the authorship of the affidavit and Agent W's role in the investigation were not the result of "neglect or innocent mistake." *See Johnson*, 660 So. 2d at 655. The statements were made, if not with intent to deceive the judge, at least with reckless disregard for whether the judge should have been informed of the truth. *See Franks*, 438 U.S. at 155–56; *Pardo*, 941 So. 2d at 1066–67; *Pagan*, 830 So. 2d at 807; *Johnson*, 660 So. 2d at 655–56. Agent W and Detective F both knew that Detective F should have signed and sworn to the affidavit, but after she ran into a computer problem, they inexplicably decided to submit the affidavit with only Agent W's signature.

We cannot conclude that the judge would have found probable cause for the search warrant if he had known the truth: the sole signer of the probable cause affidavit, Agent W, had no personal knowledge of the investigation; Agent W was meant to co-sign the affidavit for jurisdictional purposes only; and Agent W was relying solely on second-hand, unsworn representations of officers from another jurisdiction.[3]

Accordingly, the trial court erred in denying Zarcadoolas's motion to suppress the items that were seized from his home pursuant to the search warrant—the cash, the gold coins, and the casino chips. On remand, the court must suppress these items.

## II. Probable Cause Under the Forfeiture Act

We next address whether the trial court erred in finding probable cause under the Forfeiture Act for the continued seizure of the items that were taken from Zarcadoolas's home and the two seized bank accounts. We review *de novo* whether the facts before the court were legally sufficient to establish probable

---

[3] We reject BSO's reliance on the "fellow officer" rule, which provides that an officer seeking a search warrant generally can rely on evidence gathered by other officers if the officers' collective knowledge supports a finding of probable cause. *See State v. Bowers*, 87 So. 3d 704, 708–09 (Fla. 2012). When the existence of probable cause depends on evidence obtained by other officers from an anonymous or confidential source, the officer seeking the search warrant must have knowledge of the other officers' basis for finding the source to be reliable. *See id.*; *State v. Peterson*, 739 So. 2d 561, 564–68 (Fla. 1999). There was no testimony in this case that Agent W was aware of BSO's basis for concluding that the anonymous tips were reliable or that he knew the "confidential, reliable sources" cited in the affidavit were in fact wiretapped conversations.

cause.  *City of Coral Springs v. Forfeiture of a 1997 Ford Ranger Pickup Truck*, 803 So. 2d 847, 849 (Fla. 4th DCA 2002).

A forfeiture proceeding consists of two stages: (1) the probable cause stage, where the seizing agency must establish probable cause to believe that the property at issue has been used in violation of the Forfeiture Act in order to justify the continued seizure of the property; and (2) the forfeiture trial, where the seizing agency must prove beyond a reasonable doubt that the property has been used in violation of the Forfeiture Act, and must prove by a preponderance of the evidence that the owner knew or should have known that the property was being used in criminal activity, in order to obtain title to the property.  *See* §§ 932.703(3)(a), (3)(c), (7)(a), .704(8), Fla. Stat. (2020); *see also Gomez v. Vill. of Pinecrest*, 41 So. 3d 180, 184–85 (Fla. 2010); *Velez v. Miami-Dade Cnty. Police Dep't*, 934 So. 2d 1162, 1164 (Fla. 2006).

As an initial matter, we reject the notion that Zarcadoolas lacked standing to challenge the continued seizure of the property because he did not introduce sworn proof of a possessory or ownership interest.  At the probable cause stage, a person can show standing by establishing only that he or she possessed the property at the time it was seized; no proof of an ownership interest is required.  *See* §§ 932.703(3)(a), .701(2)(e), Fla. Stat. (2020) (any "person entitled to notice" of the seizure, which includes any "owner, entity, bona fide lienholder, or *person in possession of the property subject to forfeiture when seized*," may request an adversarial hearing to determine whether probable cause exists (emphasis added)); *see also Velez*, 934 So. 2d at 1164-67; *City of Fort Lauderdale v. Baruch*, 718 So. 2d 843, 846 (Fla. 4th DCA 1998).

Here, the undisputed facts established that Zarcadoolas possessed the property at the time it was seized: the cash, gold coins, and casino chips were taken from his home; the Bank of America account was registered in his name; and the Chase Bank account was registered to a company in which he was the sole member.  *See Jean-Louis v. Forfeiture of $203,595.00 in U.S. Currency*, 767 So. 2d 595, 596, 598 (Fla. 4th DCA 2000) (married couple was in possession of cash at the time it was seized, for the purpose of establishing standing at the probable cause stage, because the cash was found in their car during a traffic stop and the husband claimed the cash belonged to his business).

To justify the continued seizure of Zarcadoolas's property, BSO had the burden of establishing probable cause to believe that the property was used in violation of the Forfeiture Act.  *See* §§ 932.701(2)(f), .703(3)(a), (3)(c), Fla. Stat. (2020); *Velez*, 934 So. 2d at 1164; *City of Coral Springs*, 803 So. 2d at 850.  BSO sought to meet this burden by showing that the property was "contraband" under section 932.701(2)(a)2. or section 932.701(2)(a)5.  *See* § 932.702(2), Fla. Stat. (2020) (possession of any "contraband article" is a violation of the Forfeiture Act).  Under those provisions, BSO needed to show that the property was used "in

violation of the gambling laws of the state" or "as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony." § 932.701(2)(a)2., (2)(a)5., Fla. Stat. (2020).

BSO failed to meet its burden as to any of the property at issue. As to the cash, gold coins, and casino chips that were seized from Zarcadoolas's home, BSO did not make any allegations or present any evidence that those items were used in violation of the gambling laws or as instrumentalities in the commission of a felony. As to the two seized bank accounts, BSO alleged that the accounts were used as instrumentalities in the commission of bookmaking and money laundering offenses, but neither Detective B's affidavit nor the evidence at the adversarial preliminary hearing was sufficient to establish probable cause to support that allegation.

Detective B, in his affidavit and testimony, expressed a belief that Zarcadoolas was using the seized bank accounts to launder and conceal the cash proceeds from the organization's illegal bookmaking activity. Detective B testified that the Chase Bank account registered to Zarcadoolas's company, MZ Solutions, had an unusually high number of deposits and withdrawals in whole-number increments, and Zarcadoolas frequently transferred money from that account to his personal Bank of America account. But Detective B conceded the accounts had very little cash activity and he could not identify any specific deposits that could have been traced to the organization's proceeds.

Detective B also speculated that the two companies which had been the primary sources of the deposits to the Chase Bank account were part of Zarcadoolas's money laundering scheme. But Detective B admitted no evidence showed that any of the organization's proceeds had been deposited to either company's bank accounts.

In sum, Detective B's testimony was insufficient to establish probable cause to believe that either of the two seized bank accounts was used in violation of state gambling laws or as an instrumentality in the commission of a felony, as required by sections 932.701(2)(a)2. and 932.701(2)(a)5. Detective B's mere suspicion that Zarcadoolas was engaged in a scheme to launder and conceal the cash proceeds from the organization's illegal bookmaking activity was not enough. BSO needed to present some proof that the two bank accounts at issue were actually *used* as part of that scheme. *See Campbell v. Racetrack Bingo, Inc.*, 75 So. 3d 321, 322–23 (Fla. 1st DCA 2011) (affirming an order finding no probable cause for the seizure of bank accounts owned by persons and companies suspected of violating bingo regulations because no evidence showed that the accounts were used to carry out the alleged violations of state gambling laws); *Waheed v. State*, 134 So. 3d 531, 532–33 (Fla. 5th DCA 2014) (reversing an order finding probable cause for the seizure of motor vehicles owned by persons and companies allegedly involved in an illegal gambling scheme because no evidence showed that the motor vehicles were used as instrumentalities in

the commission of a felony). BSO failed to meet its burden because it did not present any evidence that any of the funds in either bank account could be traced to cash proceeds from the organization's alleged bookmaking activity.

As set forth above, the trial court erred in finding probable cause under the Forfeiture Act for the continued seizure of Zarcadoolas's property. On remand, the court must order BSO to restore Zarcadoolas's access to the seized Chase Bank and Bank of America accounts and return the cash, gold coins, and casino chips that were seized from his home.

### Conclusion

We reverse the order denying Zarcadoolas's motion to suppress the items that were seized from his home and the order finding probable cause under the Forfeiture Act for the continued seizure of those items and the two seized bank accounts. On remand, the trial court shall order BSO to return to Zarcadoolas the cash, gold coins, and casino chips that were seized from his home and restore Zarcadoolas's access to the seized Chase Bank and Bank of America accounts.

*Reversed and remanded with instructions.*

KLINGENSMITH, C.J., CONNER and FORST, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

11