[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 10, 2009
THOMAS K. KAHN
CLERK

No. 08-14053
Non-Argument Calendar

_____

D. C. Docket No. 07-22867-CV-JIC

MANUEL PARDO, JR.,

Petitioner-Appellant,

versus

SECRETARY, Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 10, 2009)

Before BIRCH, BLACK and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

Manuel Pardo, a Florida prisoner under sentences of death based on his nine first degree murder convictions, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. We granted a certificate of probable cause. After review and oral argument, we affirm the district court's order.

## I. BACKGROUND

In 1986, Pardo, a former police officer, and co-defendant, Rolando Garcia, were charged with nine counts of first-degree murder.[1] Their trials were severed, and Pardo was tried in 1988. Carlo Manuel Ribera was the state's first witness. He testified that he had known Garcia since 1985, knew that he was involved with drugs, and asked him for a job offloading illegal drugs from ships in 1986. Ribera heard Garcia mention Pardo as a possible source of an offloading job and eventually met Pardo at a family gathering. When Ribera visited Garcia and Pardo, they showed him newspaper clippings, a diary, and a photograph about people, including a federal agent, that they said they had killed. Ribera's testimony

---

[1] Pardo and Garcia were also charged with nine counts of possession of a firearm while engaged in a criminal offense. Pardo was convicted of this charge and sentenced to concurrent fifteen year sentences on each count. Pardo v. State, 563 So. 2d 77, 78, 81 (Fla. 1990) (per curiam). Those convictions are not addressed on appeal.

Although Garcia was initially convicted of four counts of murder, Garcia v. State, 568 So. 2d 896 (Fla. 1990), his convictions were reversed and the case was remanded for separate trials on each double homicide. On remand, Garcia was again convicted but, again, his convictions were reversed and the case was remanded for a new trial. Garcia v. State, 816 So. 2d 554, 557 (Fla. 2002) (per curiam). On the second remand, Garcia pled guilty to four counts of second degree murder and was sentenced to 25 years in prison.

2

was followed by witnesses regarding each murder.

Over his attorney's objection, Pardo testified that he had committed each of the charged murders but maintained that he killed them because they were drug dealers. He denied being involved with drugs and did not believe that it was wrong to kill the victims, who he referred to as "parasites" or "leeches," who had no right to be alive. R1-10, Exh. App. L, Vol. 11 at 3563-3566, 3573-74. He testified that, after he shot each victim, he took a picture to capture the victim's "spirit" and then burned the picture in a special ash tray. Id. at 3566-68. He explained that, while working as a police officer, he had been exposed to many victims who had been hurt by drugs. The jury found Pardo guilty of each first degree murder count.

Pardo testified during the penalty phase, over his counsel's objection and expression of doubt as to Pardo's competency, that he had not acted for financial gain but had acted as a "soldier." R1-10, Exh. App. L, Vol. 12 at 4182-86. He said that he was "ready for the death penalty" and asked that it be imposed. Id. at 4185. The jury subsequently recommended death on each count.

After considering the aggravating factors, the trial court found that the cold, calculated, and premeditated nature of the murders applied to each murder, the pecuniary gain factor applied to one murder, and the factor of hindering a governmental function applied to one murder. The trial court considered the

3

mitigating factors and found that Pardo had no significant criminal history, was under the influence of extreme mental or emotional distress, had saved the life of a child, his family loved him, and he had served in the military. After weighing the aggravating and mitigating factors and considering the jury's recommendation, the trial court imposed death sentences on each murder conviction.

The Florida Supreme Court affirmed his convictions and sentences on direct appeal, Pardo v. State, 563 So. 2d 77 (Fla. 1990) (per curiam) ("Pardo I"), and the United States Supreme Court denied his petition for writ of certiorari. Pardo v. Florida, 500 U.S. 928, 111 S. Ct. 2043 (1991) ("Pardo II").

Pardo moved for post-conviction relief in 1992, and amended and supplemented his motion 2001 and 2002.[2] The state trial court held an evidentiary hearing on three issues: (1) whether the state violated Brady v. Maryland, 373 U.S. 83 (1963) when it failed to turn over Ribera's 8-hour videotaped statement; (2) whether Pardo's trial counsel represented Pardo under a conflict of interest; and (3) whether Pardo's trial counsel was ineffective in failing to sever all nine murder counts into separate trials. During the hearing, Pardo's counsel presented two witnesses: (1) Ronald Guralnick, Pardo's trial counsel; and (2) Richard Seres, a movie producer.

---

[2] Pardo's post-conviction proceedings were stayed pending Garcia's retrial.

4

The state admitted that, despite Pardo's trial counsel's motion for discovery and the prosecutor's statement during a pretrial discovery hearing that they had turned over all the impeachment and exculpatory evidence, the Ribera videotapes were never provided to defense counsel because they did not know that they existed. The prosecution did not, however, stipulate that the tape would have been admissable at trial or could not have been discovered through counsel's due diligence. Guralnick testified that he would have used the specific contradictions in Ribera's videotaped and trial testimony for impeachment purposes.

Seres testified that, shortly after seeing a televised report on Pardo's sentencing, he and another producer, Ron Sachs, met with Guralnick and Pardo. A few weeks later, Guralnick, Sachs, and Seres signed a "letter of agreement" on 18 May 1988 and, with Pardo, signed a privacy release. R1-10, Exh. App. N, Vol. 28 at 62-66; R1-10, Exh. App. N, Vol. 29 at 192-93; R1-10, Exh. App. N, Vol.31 at Defense Exh. A, B. They met with Pardo and, after Pardo was transferred to death row, took a film crew to meet with him. The agreement provided that, in exchange for "facilitat[ing] the story," Guralnick would receive $5,000 as a "consulting fee" and up to $50,000 of any licensing fee if a movie was produced. R1-10, Exh. App. N, Vol. 28 at 68, 70-72; R1-10, Exh. App. N, Vol. 29 at 193; R10, Exh. App. N, Vol. 31 at Defense Exh. A. Guralnick received the $5,000 but

no further payment because no movie was produced.

Guralnick testified that he was retained by Pardo for an "insignificant" amount of money and that he moved to withdraw because he was concerned that his "pro bono" representation would "virtually destroy his law practice." R1-10, Exh. App. N, Vol. 29 at 183, 187-88, 190-92; R10, Exh. App. N, Vol. 31 at Defense Exh. M. Although he initially joined Garcia's motion to sever the counts, he withdrew from that motion because he believed that, "with an insanity defense, if they're all joined in one case, that if the jury believed that he was insane, then he was a total winner." R1-10, Exh. App. N at 233.

The state trial court denied post-conviction relief on all claims. The Florida Supreme Court affirmed and denied rehearing. State v. Pardo, 941 So. 2d 1057 (Fla. 2006) (per curiam) ("Pardo III").

Pardo filed his federal petition for writ of habeas corpus in 2007. The district court denied Pardo's petition, Pardo v. McDonough, No. 07-22867-Civ-Cohn (S.D. Fla. 2008) ("Pardo IV"); R1-15, and his motion to alter or amend the judgment, R1-17; ("Pardo V"). Pardo appealed, and moved for a certificate of appealability ("COA"). The district court denied his application for a COA. We initially denied his motion for a COA, but granted the motion on reconsideration.

## II. DISCUSSION

Our review of the district court's denial of Pardo's petition for writ of habeas corpus is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which establishes a "highly deferential standard" for state court judgments. Williams v. Allen, 542 F.3d 1326, 1336(11th Cir. 2008) (quotation marks and citation omitted), cert. denied, _ U.S. _ , 129 S. Ct. 2383 (2009). Under that standard, a habeas petition may not be granted as to any claim adjudicated on the merits in the state court unless the state court adjudication was contrary to, or involved an unreasonable application of, clearly established holdings of the Supreme Court or was based on an unreasonable determination of the facts as based on the evidence presented in the state court. Id. (citing § 2254(d)). We review questions of law and mixed questions of law and fact, including ineffective assistance of counsel claims, de novo, and review findings of fact for clear error. Id. (citations omitted).

On appeal, Pardo raises four issues: (1) whether the trial court erred by failing to sua sponte order a full competency hearing; (2) whether he was tried while incompetent; (3) whether he was denied effective assistance of counsel because his attorney failed to request a competency hearing, failed to discover the underlying cause for Pardo's insanity, and waived severance of the murder counts; and (4) whether he was denied his right to adversarial testing during the guilt phase

7

by the prosecution's withholding of material evidence.

A. Rejection of Pardo's Competency Claim

Pardo argues that, although his trial counsel did not formally request a competency hearing or determination, the trial court should have sua sponte ordered a competency hearing because it should have had a bona fide doubt as to Pardo's competence based on his inability to assist his attorney, his efforts to undermine his attorney, and his trial counsel's doubts as to Pardo's competence. He maintains that, during both the court-appointed sanity evaluations and the trial court's guilt and penalty court proceedings, he made bizarre statements that demonstrated his lack of (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings. He cites to his trial testimony regarding the murders; his description of the victims as "parasites," "leeches," and "undesirable dregs of society"; the photographs that he took of the victims to "capture their spirit on film"; and his process of burning the photographs and "sen[ding] their souls to the eternal fires of damnation of hell for the misery they caused on earth while they were alive." R1-10, Exh. App. L, Vol. 11 at 3565-67, 3641. Pardo explained that he learned that a "spirit stays within the body [for] three to five minutes after the person dies" from one of his 500 or so books on Naziism. Id. at

8

3568-69. He commented that Hitler "rooted out the evil" [and despite the deaths of children] "was a hero." Id. at 3570-72. He linked the drug dealers to Communists and contended that, but for his actions in "killing drug dealers," no one was going to impose the "absolute justice" that was his goal to punish the drug dealers. Id. at 3572-74, 3577. He maintains that it is irrational to plead not guilty by reason of insanity and then to tell the jury that he disagrees with his own defense and that he is not insane. He contends that his position is supported by the argument made by his attorney, just before Pardo made a statement to the jury during the penalty phase, that he did not believe Pardo was "competent to understand" whether his statement would "help him or hurt him." R1-10, Exh. App. L, Vol. 12 at 4182. He argues that the Florida Supreme Court's decision was contrary to clearly established federal law.

During the pretrial proceedings, the trial court appointed psychologist Dr. Merry Haber to examine Pardo. Dr. Haber was directed to report her findings only to Pardo's counsel. After receiving Dr. Haber's oral report, Pardo's attorney filed a motion to rely on an insanity defense. When the trial court offered to have experts appointed for a competency examination and to set a hearing, Pardo's attorney, Guralnick, responded that Pardo was competent and neither he nor any mental health expert had said that he was incompetent to stand trial. Guralnick

also stipulated that his motion was based solely on his insanity at the time of the offense. Thereafter, the trial court announced that it would appoint experts to examine Pardo regarding his sanity at the time of the offenses, but would not appoint experts to examine Pardo's "competency in view of [his] counsel's announcement[] that he was competent to stand trial." R1-10, Exh. App. L, Vol. 7 at 1440. The order appointing the experts, Dr. Leonard Haber, Dr. Sanford Jacobson, and Dr. Lloyd Richard Miller, however, included competency as one of the requested evaluations and the trial court did not specify that the evaluation was to be on sanity at the time of the offenses alone.

Four mental health experts testified during Pardo's trial, and each found Pardo competent to stand trial. Defense witness Dr. Syvil Marquit testified that Pardo was insane, but was competent to stand trial. Prosecution witnesses psychologist Dr. Leonard Haber and psychiatrists Dr. Jacobson and Dr. Miller testified that they had examined Pardo and that he was competent to stand trial. The jail psychiatrist examined Pardo on the day before the penalty phase began and his attorney opined that Pardo was not competent to make his statement to the jury, and also found him competent.

Pardo's guilt phase testimony was coherent and directly responsive to the questions asked. He was aware of the crimes with which he was charged, provided

10

a legally correct definition of homicide, and was aware of the potential penalty.

On direct appeal, the Florida Supreme Court found the issue meritless and stated that:

> There was no requirement [that the trial court order a hearing on Pardo's competency to stand trial].  When trial counsel requested that experts be appointed to examine Pardo and determine his sanity at the time of each episode, the [trial] court asked if counsel wanted experts also appointed to determine competency and offered to hold a hearing on the subject.  Counsel stipulated that his client was competent and repeated that he only wanted a determination of sanity.  The court-appointed experts examined Pardo, found him to have been sane, and also determined that he was competent to stand trial.  Thus, not only was there no reason for the court to have ordered a competency hearing, but also there was no prejudice to Pardo, as the hearing would not have benefitted him.

Pardo I, 563 So. 2d at 79.  The district court held that "the Florida Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent."  Pardo IV at 10.

A trial judge must conduct a sua sponte sanity hearing if the defendant's conduct and the evidence raises as "bona fide doubt" regarding the defendant's competence to stand trial.  Pate v. Robinson, 383 U.S. 375, 385-86, 86 S. Ct. 836, 842 (U.S. 1966).  A defendant is competent to stand trial if he possesses (1) sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him.  Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 789

11

(1960) (per curiam); Fla. R. Crim. P. 3.211(a)(1).

Pardo expressly declined the trial court's offer to hold a competency hearing, his attorney stipulated to his competence, and four mental health experts testified that Pardo was competent. The district court did not err in finding that the Florida Supreme Court's decision on this issue was neither contrary to nor involved an unreasonable application of clearly established federal law.

B.  Whether Pardo Was Tried While Incompetent

Pardo argues that he was tried while incompetent because he was physically ill with a thyroid and hormonal disorder which caused a severe mood disorders and clinical depression. He contends that, as a result of the doctors' failure to conduct physical examinations or to otherwise follow up on the physical symptoms that they observed, he was tried while suffering from significant medical problems. He maintains that it is not procedurally barred because it is based on facts developed outside of the record on direct appeal.

In his report to the trial judge, Dr. Jacobson noted that Pardo had complained about losing hair from his mustache, an eyebrow and on his arms and legs. He stated that such a loss might be attributed to stress. During the trial, he explained that, although his initial impression of Pardo's physical appearance was that he was clean, neat, and tidy, he later noticed that Pardo had "some hair loss" in one of his

12

eyebrows. R1-10, Exh. App. L, Vol. 12 at 3680. Pardo explained to Jacobson that he was also having some hair loss problems on his arms and other areas. Dr. Marquit reported that Pardo complained of hair loss but opined that it could be due to trichotillomania, a condition in which the victim pulls his hair out. Pardo denied doing this, but Marquit had observed him fingering his hair at least once.

In his post-conviction petition, Pardo requested an evidentiary hearing on the issue of his competency at trial, but the issue was found to be procedurally barred by both the trial court and by the Florida Supreme Court. The Florida Supreme Court noted that the issue was "merely a variant of his failed argument on direct appeal that the trial court should have ordered a competency hearing sua sponte" and "could have been raised on direct appeal." Pardo III, 941 So. 2d at 1062-63. The Florida Supreme Court also rejected "Pardo's attempt to avoid the procedural bar by relying on the diagnosis of a thyroid and hormonal disorder that was made after he was sentenced but allegedly rendered him incompetent to stand trial" because, based on a review "from the perspective of the circumstances" in which the experts' evaluations of Pardo were conducted, their evaluations were not so deficient as to deny Pardo due process. Id. at 1063. The Florida Supreme Court explained that the evaluating experts "appropriately focused" on Pardo's comprehension and ability to reason in making their competence determination and

13

not on his physical symptoms or illness.  Id. at 1064.

The district court denied the claim noting that it could have been raised on direct appeal, and that Pardo failed to show prejudice because he had not produced any medical records that would have changed the experts' conclusions that he was mentally competent to stand trial.  It concluded that the Florida Supreme Court's conclusion did not unreasonably apply clearly established Supreme Court precedent.

Although the district court correctly found that this claim was procedurally defaulted, the claim also fails substantively. In evaluating such a claim, we concern ourselves with the facts that could have indicated to the trial court that the mental health professionals who evaluated Pardo provided incompetent assistance and should have ordered a physical examination.[3]  See Clisby v. Jones, 960 F.2d 925, 930 (11th Cir. 1992) (en banc).  Besides the professionals' comments about Pardo's hair loss, which at least one attributed to stress, there was no evidence

---

[3]  To the extent that Pardo also raises a substantive incompetence claim, "the procedural default rule . . . does not operate to preclude a defendant who failed to request a competency hearing at trial or pursue a claim of incompetency on direct appeal from contesting his competency to stand trial and be sentenced though post-conviction proceedings." Adams v. Wainwright, 764 F.2d 1356, 1359 (11th Cir. 1985).  Although this aspect of his claim is not procedurally barred, he has not presented sufficient evidence to show entitlement to a post-conviction evidentiary hearing.  Pardo's only evidence of incompetency is his post-trial diagnosis of a thyroid and hormonal disorder as a physical cause of his incompetence.  This is not sufficient to "positively, unequivocally, and clearly generate the [requisite] legitimate doubt" as to his competency at the time of trial.  Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995) (quotation marks and citation omitted).

14

submitted to the trial judge of any physical ailments suffered by Pardo which would have affected his competence.

To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and that ability must be of record. Dusky, 362 U.S. at 402, 80 S. Ct. at 788. The state court's factual conclusions regarding a defendant's competence to stand trial are entitled to a presumption of correctness, and can be overcome only with clear and convincing evidence of incompetence. Demosthenes v. Baal, 495 U.S. 731, 735, 110 S. Ct. 2223, 2225 (1990) (per curiam); Sanchez-Velasco v. Secretary, 287 F.3d 1015, 1030 (11th Cir. 2002). On a post-conviction incompetency claim, "the standard of proof is high": the petitioner must present a preponderance of "clear and convincing evidence" of "positive[], unequivocal[], and clear[]" facts "creating a real, substantial and legitimate doubt" as his competence. Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995). Evidence of incompetence "must indicate a present inability to assist counsel or understand the charges." Id. at 1107. Absent evidence of such an inability, evidence of low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence to stand trial. Id.

The Florida Supreme Court correctly identified and applied  Supreme Court

15

precedent. Pardo did not come forth with the "new" evidence of his alleged incompetence due to his thyroid condition until 2001, and even then it was merely an assessment that he suffered from an "altered mental status secondary to a general medical condition of thyroid impairment" at the time of his trial which rendered him incompetent. R1-10, Exh. App. N Vol. 25 at 102. As the Florida Supreme Court observed, this evaluation does nothing to the three evaluations rendered at the time of Pardo's trial that he was competent. Further, it is clear that Pardo "failed to develop" this claim timely in the state court. Pardo's thyroid condition was discovered before his direct appeal brief was filed, and yet it was not addressed or developed until three years later.

C. Denial of effective assistance of counsel

1. Failure to request a competency hearing or discover Pardo's medical infirmity

Pardo contends that, although his attorney, Guralnick, objected to Pardo's testimony and believed that Pardo was incompetent to understand how his statements during the penalty phase would affect him, Guralnick failed to move for a competency hearing. He maintains that the appointed experts observations of Pardo's physical state should have put the experts and Guralnick on notice of his medical condition. He argues that a competency hearing would have permitted

16

him the opportunity to test the experts' findings in an adversarial setting. He asserts that the Florida Supreme Court's ruling on this issue is an unreasonable application of United States Supreme Court precedent and that the district court overlooked the facts in concluding that the Florida court was not unreasonable.

The Florida Supreme Court affirmed the trial court's summary denial of this issue. It held that "in light of the experts' conclusions that Pardo was competent" there was no reason to hold an evidentiary hearing, and that his "trial counsel acted well within the range of reasonable professional assistance in declining to request . . . a competency determination." Pardo III, 941 So. 2d at 1063. Pardo's "counsel did not render constitutionally deficient performance in failing to alert the experts to a condition for which physical symptoms first appeared while Pardo was detained pending trial, and that was not diagnosed until after Pardo was convicted and sentenced." Id. at 1064.

The district court affirmed, finding that it was not an unreasonable application of Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984) because it was predicated on the trial court's investigation of Pardo's competency through the evaluations and Pardo's attorney's "reasonable" reliance on the four experts reports in determining not to seek a competency hearing. R1-15 at 16.

Pardo's counsel's duty was to conduct a reasonable investigation or to make

17

a reasonable decision that an investigation was unnecessary. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Id.

The record reflects that Pardo's counsel investigated Pardo's mental health and, after perceiving of issues with Pardo's mental health, requested the appointment of a mental health professional for an evaluation. Pardo's counsel also had Pardo evaluated on four different days by another mental health professional and reported to the trial court that none of the doctors had found Pardo to be incompetent. Pardo was also evaluated by three additional experts who each testified that Pardo was competent. Based on five experts' testimony that Pardo was competent, Pardo's counsel made a reasonable investigation of Pardo's mental state. Neither the fact of Pardo's actions contrary to his attorney's advice nor the physical manifestations of his thyroid condition equate to incompetence to stand trial. See Medina, 59 F.3d at 1107 ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial.") The district court did not err in finding that the Florida court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

2. Waiver of motion to sever murder counts

18

Pardo argues that his defense attorney unreasonably and prejudicially withdrew his motion to sever the counts and agreed that the murder counts could all be tried together. He contends that his attorney's actions were motivated by his concerns for his own financial situation instead of concern for Pardo's best interests. He maintains that the facts of numerous charges, including the nine murder charges, made it difficult for the jury to evaluate each charge separately. The State responds that the issue is not within the certificate of appealability.

Our review on the merits of a 28 U.S.C. § 2254 petition is limited to those issues specified in a certificate of appealability and to those issues for which the petitioner has made a substantial showing of the denial of a constitutional right. Hodges v. Attorney Gen., 506 F.3d 1337, 1339-40 (11th Cir. 2007). Although the certificate of appealability issued by us did not specify any issues, Pardo did not raise the issue of the ineffectiveness of his counsel for his waiver of the severance motion in his motions for certificate of appealability in the district court or in this court, or in his request for reconsideration in this court. See generally R1-19 at 3, 8-9. He thus waived the issue in this court. However, he also fails on the merits of this issue.

During pretrial proceedings, Pardo's attorney moved for severance of various counts and the defendants. The trial court denied the motion in part but

19

severed the trial of each defendant and of two of the murder counts. R1-10, Exh. App. L., Vol. 7 at 1522-31, 1536; R1-10, Exh. App. L, Vol. 8 at 1577. During the jury selection, however, Pardo's attorney withdrew the motion to sever the counts and agreed that all of the murder counts, including the earlier severed counts, should be tried together. The trial court granted the request, directed that all of the charged counts would be tried together, and observed that "in the view of [Pardo's insanity] defense, [Pardo's attorney] feels, obviously, and I can see why, it best to try his client on all counts." R1-10, Exh. App. L, Vol. 8 at 1841-42. When the prosecution requested confirmation that Pardo had been advised that the counts would all be tried together and asked whether he had any objections, the trial court commented that it had observed Pardo's attorney "confer with him" and Pardo's attorney confirmed that he did so. Id. at 1908.

During the post-conviction evidentiary hearing, Pardo's counsel testified that he decided to try all of the murder charges at one time because, based on the insanity defense, he believed that he had a better chance of prevailing. R1-10, Exh. App. N, Vol. 29 at 232-33. The trial court denied the claim, finding that "[t]he strategy used by [Pardo's attorney] was reasonable." R1-10, Exh. App. N, Vol. 27 at 374. The Florida Supreme Court affirmed, finding that Pardo had failed to satisfy either the deficient performance or prejudice prongs of an ineffective

assistance of counsel claim. Pardo III, 941 So. 2d at 1072. It held that Pardo's attorney "made a reasonable strategic decision involving an informed choice among alternatives" which was "reinforced" by Pardo's own testimony in which he "acknowledged killing all nine victims and opined that his acts were not murders because his victims were drug-dealing parasites rather than human beings." Id. at 1071. It also noted that Pardo's claim that the strategy was based on Pardo's attorney's financial concern was not supported by the record as the only evidence was the "unfiled motion to withdraw" which was prepared fifteen months before his attorney decided to seek a single trial. Id. at 1071-72. It also concluded that, although the counts were severable, Pardo failed to show a reasonable probability of a different result if the counts had been tried separately because both "the physical and testimonial evidence against Pardo was strong." Id. at 1072.

The district court denied the claim for ineffective assistance for waiving severance, finding that the Florida Supreme Court's rejection of the claim was neither contrary to nor an unreasonable application of clearly established United States Supreme Court precedent.

The district court's ruling on this was correct. The state court's factual finding that the severance decision was strategic was supported by the record. Pardo's attorney testified that it was a strategic decision made after the defense of

21

insanity was pursued and after consultation with Pardo. Although Pardo's attorney may have had financial concerns fifteen months before the severance waiver was made, he never filed his motion to withdraw based on that reason. Further, the Florida Supreme Court held the strategy reasonable. Pardo's insanity defense was that he was compelled to kill the victims by unconscious impulses. See R1-10, Exh., App. L, Vol. 12 at 3492-93, 3497. The Florida Supreme Court thus reasoned that counsel's decision to try the charges together provided more credibility to the assertion of compulsion.

D. Whether Pardo was denied his right to adversarial testing during the guilt phase by the prosecutor's withholding of material evidence.

Pardo argues that he was denied his due process rights under Brady because the prosecution withheld Ribera's videotaped statement which was crucial impeachment evidence. He contends that the prosecution's failure to disclose this evidence prejudiced him by limiting his tools to successfully move for suppression of the search warrant because the tapes make it clear that Ribera's interview and polygraph exams were orchestrated to support a search warrant. He maintains that the tapes show that Ribera was a liar and was provided with information by the Metro-Dade police officers. He claims that the tapes show that Ribera was coached, told how to take the tests, and provided with the test questions when he

22

continued to fail. He also states that the inconsistencies between Ribera's taped statements and his trial testimony could have been used for impeachment. He asserts that the tapes show that Ribera changed his statements regarding Pardo's role in the crimes and where he learned about Pardo's involvement. He suggests that the Ribera's physical appearance on the tapes indicates that he as actually impaired from drug use during his statement. He also argues that the suppression of the tapes deeply impaired the defense's investigations and preparation for trial. He comments that, if the tapes had been available, a reasonable doubt, instead of insanity, strategy might have been used. He maintains that the Florida Supreme Court's denial of this claim was an unreasonable application of the law.

During the post-conviction evidentiary hearing, Pardo's attorney testified that, although he probably tried to develop different legal theories for the defense, "[r]easonable doubt . . . was certainly not viable." R1-10, Exh. App. N, Vol. 29 at 144. He explained that he investigated Ribera and learned that he was thought of as "crazy," "a fabricator," "a person of ill repute, and "a person who mistreated his own family." Id. at 146-47. He confirmed that, during the trial, he asked Ribera whether he was "an unadulterated liar" and made similar attacks on Ribera's credibility. Id. at 156. He explained that he "might have" used Ribera's contradictory statements for impeachment but would have made that determination

23

based on the circumstances.  Id. at 159, 164.  He explained that he would not have used the tape testimony  if it was not relevant, unless he had little else.

Although Pardo alleged that the search warrant falsely stated that Ribera provided details of the crimes that were not known to the public, the search warrant affiant outlined numerous details of the crimes that Ribera knew but did not indicate his source.  R1-10, Exh. App. L, Vol. 3 at 144-49.  In the videotape, Ribera said that, after hearing from Pardo and Ribera that they had killed two victims at an identified apartment complex, he saw a report about the murders at that same apartment complex on television the next morning and began to believe the stories that Pardo and Garcia were telling him.  R1-10, Exh. App. N, Vol. 31, Exh. F, Tape 2 at 19; Tape 4 and 5 at 26-27.  Ribera specifically denied being under the influence of alcohol or drugs at the time of the videotaping.  Id., Tape 1 at 27-28.

The trial court denied this claim finding that the tapes could not have placed the entire case in a different light because Pardo's attorney had evidence that Ribera was a habitual liar, and used that evidence to attack Ribera's credibility during the trial. Based on Pardo's attorney's possession of similar impeachment evidence at the time of the trial and Pardo's insistence on testifying that he committed the murders, the trial court held that the confidence in verdict was not

undermined.

Before addressing the issues raised in Pardo's post-conviction appeal, the Florida Supreme Court explained that it needed to distinguish Pardo's case from that of his co-defendant, Garcia, in which it "ruled that the nondisclosure of the Ribera videotapes required a new trial." Pardo III, 941 So. 2d at 1066. It stated that "Pardo's trial testimony admitting the killings places the nondisclosure in a far less prejudicial light than in Garcia's case" and that other evidence, not present in Garcia's case, "also strongly implicated Pardo," including a projectile fired from one of the murder weapons and removed from Pardo's foot; a spent casing fired from the same murder weapon and matching a casing under one of the murder victims found in Pardo's closet; "blood and bullets" connected to another murder found in Pardo's car, and a diary in Pardo's handwriting and containing newspaper articles about the murders found in Pardo's apartment. Id. It concluded that the nondisclosure of the Ribera videotapes did not result in prejudice warranting a new trial because Pardo's counsel made no showing of how the videotapes would have led to suppression of the evidence obtained via the search warrant, the search warrant affidavit was not based solely on Ribera's testimony, there was ample evidence connecting Pardo to the murders which was not seized under the search warrant, and Pardo's "motivation in testifying was to claim credit for the vigilante

25

killings and refute . . . Ribera['s suggestion] that Pardo was a drug dealer" and was unrelated to the incriminating nature of the evidence seized from his apartment. Id. at 1068. It again noted that "Pardo's in-court confession in his own trial negates any prejudice from the nondisclosure of the Ribera videotapes" and that there were no inconsistencies in Ribera's testimony that undermined the verdict. Id. at 1068-69. It observed that several of Ribera's statements, including his description of Pardo as the killer, were not inconsistent and were buttressed by the physical evidence against Pardo. It also found that Pardo had failed to establish that disclosure of the videotapes would have affected his decision to testify because it was clear from his trial testimony that he did so, not to "contest Ribera's testimony in general or his implication of Pardo in the nine murders," to challenge Ribera's testimony that he benefitted financially from them and because he did not testify in support of his counsel's position at the evidentiary hearing. Id. at 1069-70.

Reviewing each of Pardo's claims as to the nondisclosure, the district court found that "the Florida Supreme Court's rejection of [Pardo's] Brady claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent. Pardo IV at 23.

In order to state a Brady claim, the defendant must show that (1) the evidence is favorable as exculpatory or impeaching; (2) the evidence was

26

suppressed either willfully or inadvertently; and (3) prejudice resulted.  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999).  To be prejudicial, the evidence must be such at that disclosure of it would have created a reasonable probability that the proceeding result would have been different.  Id. at 280, 119 S. Ct. at 1948.  The non-disclosure of cumulative or repetitious evidence is not sufficient to establish a Brady claim.  United States v. Agurs, 427 U.S. 96, 110 n. 16, 96 S. Ct. 2392, 2400 n.16 (1976).

Although Pardo may be able to meet the first two prongs, he is unable to show prejudice.  He failed to show that production of the videotape would have prevented him from confessing his guilt or otherwise altered his trial strategy. Pardo's claims that the affidavit contained false information is incorrect, and thus production of the tape would not have led to a motion to suppress the warrant. Ribera did not change his position regarding Pardo's role in the murders.  Pardo's attorney was aware of Ribera's credibility issues and addressed it during the trial.

## III.  CONCLUSION

For the reasons stated above, we AFFIRM the district court denial of Pardo's petition for writ of habeas corpus.

**AFFIRMED.**